UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
LOCAL 282, INTERNATIONAL BROTHERHOOD          NOT FOR PUBLICATION
OF TEAMSTERS,

                    *Plaintiff*,                  **FINDINGS OF FACT AND**
                                                  **CONCLUSIONS OF LAW**

     -against-                                 09-cv-4535(KAM)(LB)

PILE FOUNDATION CONSTRUCTION CO.,
INC.,

                    *Defendant*.
-----------------------------------X
**MATSUMOTO, United States District Judge:**

          Plaintiff Local 282, International Brotherhood of

Teamsters ("Union") commenced this action on October 21, 2009

against Pile Foundation Construction Co., Inc. ("Pile"), seeking

enforcement of an arbitration award under Section 301 of the

Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  (*See*

ECF No. 1, Complaint ("Compl.").)  Specifically, the Union

seeks: (1) to confirm the October 1, 2009 arbitration award

issued by Jack D. Tillem (the "Award"); (2) an order directing

Pile to pay John Montgomery ("Montgomery") the wages and

benefits lost due to Pile's failure to abide by the Award; and

(3) an award of attorney's fees and costs.  (*See* Compl. at 5.)

These claims were tried before this court on October 28, 2010.

(*See* ECF Minute Entry dated 10/28/2011.)  At the close of the

Union's case, Pile moved for judgment as a matter of law,[1]

_____

[1]     In the trial transcript, the court misspoke and referred to Pile's
motion as a motion for judgment on the pleadings.  (*See* Tr. at 73.)  The

arguing that the Union failed to present any evidence that Pile
received the Award in the manner required by the Collective
Bargaining Agreement ("CBA"), and the court reserved ruling.
(Tr.[2] at 65-73.)

Having considered all the evidence at trial, assessed
the credibility of the witnesses, and reviewed the parties'
post-trial submissions, the court denies Pile's motion for
judgment as a matter of law, and makes the following findings of
facts and conclusions of law pursuant to Federal Rule of Civil
Procedure 52[3] ("Rule 52").  The court ultimately concludes, for
the reasons set forth below, that the Award draws its essence
from the CBA and is therefore confirmed, that Pile refused to
reinstate Montgomery from October 14, 2009 until April 28, 2010,
and is liable to Montgomery for lost wages and benefits during
that period, that Pile unjustifiably refused to abide by the
Award and the Union is entitled to reasonable attorney's fees,
costs, and pre-judgment interest.

---

motion, however, is a motion for judgment as a matter of law, and will be
analyzed as such by the court.

[2]     Citations to the bench trial transcript from October 28, 2010 are
designated "Tr."

[3]     Rule 52 provides, in relevant part, that following a bench trial, "the
court must find the facts specially and state its conclusions of law
separately."  Fed. R. Civ. P. 52.

## <u>MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

At trial, after the Union rested, Pile moved for judgment as a matter of law, arguing that the Union failed to present any evidence that Pile was provided with a copy of the Award in the manner required by the CBA. (Tr. at 65-73.) The Union opposed the motion, arguing that the facts established that both Pile and its attorneys were in receipt of the Award and that the provision in the CBA upon which Pile relied regarding service does not apply to service of arbitration awards. (*Id.*) Pile requested leave to make submissions, and the court set up a schedule for briefing in support of or in opposition to the motion for judgment as a matter of law. (*Id.* at 128-29, 131.) Pile failed to make any submissions in support of its motion. The Union filed a memorandum in opposition, arguing that the motion for judgment as a matter of law should be denied because: (1) it deviates from the pretrial order; and (2) Pile received a copy of the Award both through the arbitrator and through its attorneys. (ECF No. 20, Plaintiff's Memorandum of Law in Opposition to Defendant's Application for Judgment at 5-10.)

The court agrees with the Union that Pile is precluded from arguing that it did not receive a copy of the Award in the manner required by the CBA. Rule 16 of the Federal Rules of Civil Procedure provides that a pretrial order "controls the

course of the action," and the "court may modify the order . . . only to prevent manifest injustice." Fed. R. Civ. P. 16(d), (e). "It is an established procedural principle that a party's failure to include a legal theory or defense in the pre-trial order results in its subsequent abandonment or waiver." *Colli v. Wirth*, No. 94 Civ. 3234, 1996 WL 442835, at *1 (S.D.N.Y. Aug. 6, 1996); *MEI Int'l, Inc. v. Schenkers Int'l Forwarders, Inc.*, 807 F. Supp. 979, 989 (S.D.N.Y. 1992) (failure to include facts relating to statute of limitations defense in proposed findings of fact section or elsewhere in joint pretrial order waived the defense); *cf. Solinsky v. Arthritis Found.*, 635 F. Supp. 620, 622 (E.D.N.Y. 1986) (finding that claims alleged in the complaint but not listed in the pretrial order were deemed abandoned).

The court recognizes that the pretrial order is not a legal "'strait jacket' binding the parties and court to an unwavering course at trial," and that the court has discretion to deviate from the order to prevent manifest injustice. *Napolitano v. Compania Sud Americana De Vapores*, 421 F.2d 382, 386 (2d Cir. 1970); *see also HBE Leasing Corp. v. Frank*, 22 F.3d 41, 45 (2d Cir. 1994). Exercise of such discretion is not warranted in this case.

The facts underlying the defense that Pile did not receive a copy of the Award in the manner required by the CBA

have been available to Pile from the outset of the litigation. Yet Pile failed to raise the defense in either its answer to the complaint or in the joint pretrial order submitted prior to trial. (ECF No. 6, Answer; ECF No. 13, Joint Pretrial Order ("JPTO").) Instead, Pile waited until trial, at the close of the Union's case, to raise its defense. (Tr. at 65.) Such practice "clearly violates both the letter and the spirit of [Rule 16]." *See Napolitano*, 421 F.2d at 386 (finding that "waiting until four days prior to the trial date to identify [] witnesses by name clearly violates both the letter and the spirit of the rule"). Consequently, the court finds that Pile is precluded from raising the defense that it did not receive a copy of the Award in the manner required by the CBA.

Even if the court considered the defense on the merits, the court would still deny judgment based on the evidence and as a matter of law. Pile argues that Section 9(G)(2) of the CBA required that the Award be served "by registered or certified mail, return receipt requested; by telegram with proof of service; or by any other method or manner, provided receipt thereof is confirmed by the recipient." (ECF No. 13-3, Stipulated Exhibits, Ex. (i), 2006-2009 Collective Bargaining Agreement ("06-09 CBA") at 13.) Section 9(G)(2) governs service of "[a]ll notices required or permitted

to be given by [Section 9], including the decision of the Panel." (*Id.*)

First, it is unclear whether Section 9(G)(2) applies to service of a decision by an arbitrator, such as the Award at issue here. Section 9(F), governing arbitration of discharge and disciplinary actions, does not explicitly address or even mention a notice requirement, however, it is a part of Section 9 which includes subsection 9(G)(2) regarding service. (*Id.* at 12-13.) Even assuming that Section 9(G)(2) does apply to service of the Award, the section allows service "by any other method or manner, provided receipt thereof is confirmed by the recipient." (*Id.* at 13.) Here, the Award was mailed to Pile by United States Postal Mail. (*See* Ct. Ex. 1, Award Mailing Envelope.) Both Pile and its counsel have confirmed numerous times their receipt of the Award no later than October 13 or 14, 2009. (Tr. at 70, 78.) Thus, the Award was served by a method allowed by the CBA and receipt was confirmed by the recipient, in compliance with the clear language of the CBA.

Accordingly, Pile's motion for judgment as a matter of law is denied because Pile waived the service defense by failing to raise it in its answer to the complaint or in the joint pretrial order and, alternatively, because service was made in compliance with the CBA.

**FINDINGS OF FACT**

I.   The Collective Bargaining Agreement

     *A. The Grievance Procedure*

          Pile is signatory to a series of CBAs with the Union,
which govern the terms and conditions of employment for certain
of Pile's employees represented by the Union.  (JPTO,
Stipulations of Fact, at 5.)  The most recent CBA, effective
July 1, 2009 to June 30, 2013, was introduced into evidence at
trial as Stipulated Exhibit (ii).  (*See* ECF No. 13-3, Stipulated
Exhibits, Ex. (ii), 2009-2013 Collective Bargaining Agreement.)
The preceding CBA, effective July 1, 2006 to June 30, 2009, was
introduced into evidence at trial as Stipulated Exhibit (i).
(*See* 06-09 CBA.)  Because the grievance at issue in this case
was initiated pursuant to the 2006-2009 CBA, all references will
be made to this version of the CBA, Stipulated Exhibit (i).

          Section 9 of the CBA, "Settlement of Disputes,"
contains the parties' contractually established grievance and
arbitration procedures.  (*See id.* at 11-14.)  Pursuant to
Section 9(F), an employee may be discharged or otherwise
disciplined "for just cause only," and any dispute between Pile
and the Union in connection with the discharge or discipline of
an employee which cannot be adjusted by the parties "shall be
submitted for arbitration."  (*Id.* at 12.)  The "determinations,
decisions and awards" issued under Section 9 of the CBA,

including an arbitration award, "shall be final, conclusive and binding upon the parties hereto and may be enforced as any other arbitration award in accordance with the laws of the State of New York." (*Id.* at 13.) Further, in the event Pile "fails to abide by an award" of an arbitrator, the Union is entitled to "take such action as it deems appropriate . . . including a strike" in order to enforce the award. (*Id.*)

*B. The Discharge of John Montgomery*

Montgomery was the On-Site Steward ("OSS") assigned by the Union for a Pile project near the East River in Manhattan ("Pile job site"). (Tr. at 36.) Section 10(B) of the CBA provides for the employment of an OSS at job sites where the total gross cost of all construction exceeds a certain dollar amount. (06-09 CBA at 15-17.) The CBA further provides that the appointment of the OSS "shall be . . . from the seniority list of the Employer." (*Id.* at 16.) Pursuant to Section 10(B), the duties of an OSS "include, but are not limited to, the normal duties of a Teamster, the hauling of materials for any Employer or Employers in a vehicle provided by his Employer, and the coordination of safety efforts relating to Teamsters on the site." (*Id.*)

On June 25, 2008, Pile discharged Montgomery. (JPTO, Stipulations of Fact, at 5.) The Union challenged the discharge and, when the Union was unable to resolve the dispute with Pile,

the matter was submitted for arbitration.  (*Id.*)  The Union
replaced Montgomery with Victor Nicholasi ("Nicholasi") as the
OSS when Montgomery was discharged by Pile, informing Nicholasi
that he would be OSS at the Pile job site until the dispute
regarding Montgomery was resolved.  (Tr. 11, 35-36, 50.)  The
Union has the authority to select the OSS, but must select from
within the employee ranks of the employer.  (*Id.* 111-12.)  The
Union has no authority to select an OSS from outside the
employee ranks, except in very narrow circumstances such as when
the Union can prove fraud committed against the trust fund.
(*Id.* at 111.)

## II.  The Award

      The parties designated arbitrator Jack D. Tillem (the
"arbitrator") to hear and determine the dispute regarding the
discharge of Montgomery.  (JPTO, Stipulated Facts, at 5.)
According to the Award, the arbitrator was authorized to
determine two issues: (1) whether the discharge of Montgomery
was for just cause, and if not, the appropriate remedy; and
(2) whether Pile violated the contract when it stopped paying
Montgomery his salary on March 31, 2009, and if so, the
appropriate remedy.  (ECF No. 13-3, Stipulated Exhibit (iii),
Opinion and Award ("Award") at 2.)

      The arbitrator held four days of hearings, and each
party had the opportunity to present and cross-examine

witnesses, introduce exhibits, and offer argument. (*Id.* at 1;
JPTO, Stipulated Facts, at 5-6.) On October 1, 2009, the
arbitrator issued the Award, "rescinding the termination of []
Montgomery and replacing it with a suspension without pay from
March 31, 2009 to the date of his return promptly upon receipt
of this award by the parties." (Award at 9.) The arbitrator
found that although Montgomery "was insubordinate" and
"committed a serious violation of the collective bargaining
agreement[,] . . . his eight years of service and his role as an
OSS render his discharge without any progressive discipline a
difficult proposition." (*Id.* at 6-8.) Finding that "[n]othing
in the evidence would suggest that [Montgomery] would not change
his behavior if he were allowed to return to his position," the
arbitrator rescinded the termination and replaced it with a
suspension without pay. (*Id.* at 8.)

III. <u>Receipt of Award and Refusal to Reinstate Montgomery</u>

Louis Bisignano ("Bisignano"), the Secretary Treasurer
for the Union, received a letter from the arbitrator dated
October 1, 2009, attaching the invoice for the arbitration and a
copy of the Award. (Tr. 5-7; *see also* Award.) The Union and
Pile agreed to share payment of the arbitrator's invoice. (*See*
Award.) Bignano then contacted Anthony Rivara ("Rivara"), the
owner of Pile, and informed him that he had received a copy of
the Award and that Montgomery was to be reinstated. (Tr. 7.)

Rivara responded that he would not reinstate Montgomery and that Bisignano "could do what [he] gotta do and go where [he] gotta go." (*Id.*) Bisignano warned Rivara that the Union could enforce the Award either in court or through a strike, but Rivara maintained that he would not reinstate Montgomery. (*Id.* at 7-8.)

After receiving this response from Rivara, Bisignano contacted Anthony D'Aquila ("D'Aquila"), the Manhattan Business Agent for the Union, and relayed the information regarding the Award and the conversation with Rivara. (*Id.* at 9, 42-43.) D'Aquila stated that he would go to the Pile job site to speak with Rivara directly. (*Id.* at 9-10, 43-44.) The next day, D'Aquila went to the Pile job site and spoke with Rivara. (*Id.* at 10, 45.) D'Aquila again informed Rivara that the Award required Pile to reinstate Montgomery. (*Id.* at 45.) Rivara "expressed his dissatisfaction with the arbitrator's decision," complained that the arbitrator "didn't know the rules of arbitration," and that therefore he would not put Montgomery back to work. (*Id.* at 45-46.) Further, Rivara showed D'Aquila an email from his attorney, saying: "Even my attorney is advising me to put the guy back to work." (*Id.* at 46.) D'Aquila urged Rivara to listen to his attorney, but Rivara refused. (*Id.*)

Prior to D'Aquila's visit to Rivara, Bisignano and D'Aquila had a conversation with Montgomery. (*Id.* at 47, 57-58.) They informed Montgomery of the Award, and instructed him to go to the Pile job site and report to work. (*Id.* at 47, 58.) Montgomery reported to work on a Wednesday[4] morning. (*Id.* at 47, 58.) When Montgomery told Rivara that he was reporting to work pursuant to the Award, Rivara responded that he "[didn't] want [him] back." (*Id.* at 47, 59-60.) Rivara further stated that he could not "kick [Montgomery] off the job, because the park is a public place," but instructed Montgomery to "stay off the work premises." (*Id.* at 60.) At the instruction of the Union, Montgomery continued reporting to work for the remainder of the week. (*Id.* at 48, 60-61.) On Thursday morning, Montgomery reported to work at the Pile job site and stood outside the work premises. (*Id.* at 48, 60.) Rivara sent a manager, Howie Porsche, to inform Montgomery that Rivara was "still not going to put [him] back to work." (*Id.* at 60.) On Friday morning, Montgomery again reported to work at the Pile job site and stood outside the work premises. (*Id.* at 61.) This time, Rivara sent Nicholasi to inform Montgomery that would not be put back to work. (*Id.*) At that point, the Union instructed Montgomery to stop reporting to the Pile job site so as to not upset Rivara,

_____

[4] The court will discuss the specific dates of these events below.

and that the Union would "handle it accordingly." (*Id.* at 48, 61.)

The parties' main dispute concerns the timing of the events described above. The October 1, 2009 letter from the arbitrator, attaching an invoice for the arbitration and a copy of the Award, is stamped as received by the Union's counsel on October 6, 2009. (*See* Award.) Bisignano testified that his conversation with Rivara regarding reinstatement of Montgomery pursuant to the Award occurred "in early October of 2009," around the "second week of October 2009." (Tr. at 7.) D'Aquila similarly testified that his visit to the Pile job site to speak with Rivara occurred around the "second week of October." (*Id.* at 44.) Specifically, D'Aquila testified that "[t]o [his] best recollection," the events took place "the second week of October, a Wednesday" and that he "believe[d] it was the 14th of October, somewhere in that area." (*Id.* at 52.) Montgomery testified that his conversation with Bisignano and D'Aquila took place "either the Friday or the Monday prior to the Wednesday [he] was supposed to go back to work." (*Id.* at 57.) Montgomery explained that during this conversation, when Bisignano and D'Aquila instructed him to report to work, he informed the Union that he "would go back to work on the Wednesday, because the payroll week end[ed] on Wednesday." (*Id.* at 58.)

Rivara, on the other hand, testified that the visit from D'Aquila to the Pile job site to discuss the reinstatement of Montgomery pursuant to the Award occurred on October 7, 2009. (*Id.* at 77.) Moreover, Rivara testified that he did not receive a copy of the Award from the arbitrator until October 13, 2009, because the original mailing was mistakenly sent to the wrong address. (*Id.* at 78, 80.) Rivara produced a copy of the envelope he received from the arbitrator, which was marked as a court exhibit. (*Id.* at 103-04; Court Exhibit 1 ("Mailing Envelope").) The envelope is postmarked October 5, 2009, and shows a forwarding notification dated October 8, 2009. (Mailing Envelope.) The envelope also contains a handwritten notation from a Pile employee indicating that the mailing was received on October 13, 2009. (*Id.*; Tr. at 82, 103-04.) Rivara testified that during his conversations with Bisignano and D'Aquila, Rivara demanded to see a copy of the Award, and that neither produced it. (Tr. at 75-76, 79.) According to Rivara, he told the Union to "give [him] a call" once they got the Award. (*Id.* at 76.) Rivara testified that Montgomery never showed up for work after Pile received a copy of the Award, and it was up to the Union to assign the OSS position to Montgomery and remove Nicholasi from the position. (*Id.* at 80-81.)

Michael Abi Oun ("Abi Oun"), an engineer consultant working at the job site in question, testified that he received

a copy of the Award "[t]hrough Pile Foundation's office on the
day it came in," and that he "believe[d]" it was "on a Tuesday."
(*Id.* at 114-16, 118.)  Abi Oun testified that, after receiving
the Award, "a lot of time . . . passed" before he saw Montgomery
on the job site again, and that Montgomery did not report to him
in October of 2009.  (*Id.* at 118-20.)  Abi Oun further testified
that he saw D'Aquila at the job site in October of 2009, and
that D'Aquila informed him of the Award at that time.  (*Id.* at
124-25.)  On the occasions Abi Oun discussed with Rivara
reinstating Montgomery pursuant to the Award, Rivara responded
that "he did not want [] Montgomery to come back to work."  (*Id.*
at 125-26.)

   The court finds credible the testimony offered by
Bisignano, D'Aquila and Montgomery concerning the timing of the
above described events.  Both Bisignano and D'Aquila credibly
testified that the Union's efforts to reinstate Montgomery
pursuant to the Award occurred during the second week of October
of 2009, and D'Aquila specifically testified to meeting with
Rivara on October 14, 2009.  Moreover, the mailing by the
arbitrator containing the Award was postmarked October 5, 2009,
a Monday.[5]  Montgomery testified, again credibly, that he spoke
with Bisignano and D'Aquila about the Award on either the Friday

---

[5] The court takes judicial notice of the October 2009 calendar, available at
http://www.timeanddate.com/calendar/monthly.html?year=2009&month=10.

or the Monday before reporting back to work on Wednesday.
Because the Award mailing was postmarked on Monday, October 5,
2009, the earliest the Union could have received the Award was
Tuesday, October 6, 2009.  In fact, as indicated by the date
stamp on the copy of the Award, that is the same date the
Union's counsel received the Award.  (*See* Award (date stamp on
first page reflecting date of receipt).)  Montgomery's
conversation with Bisignano and D'Aquila must necessarily have
occurred the following Friday, October 9, 2009, or Monday,
October 12, 2009.  Montgomery reported to work at the Pile job
site the following Wednesday, October 14, 2009, the same day
D'Aquila met with Rivara.

  In making this finding, the court does not find
convincing the testimony by Rivara regarding the timing of his
receipt of the Award and his response to the efforts by the
Union and Montgomery to enforce the reinstatement order.  At the
outset, Rivara made clear to Bisignano and D'Aquila that he
would not return Montgomery to work because he disagreed with
the Award, stating that the arbitrator "didn't know the rules of
arbitration."  Abi Oun similarly testified that Rivara stated he
did not want to return Montgomery back to work.  The court
cannot accept Rivara's position that Montgomery and the Union
are at fault for not returning Montgomery to work, as the Award
clearly provided that Montgomery was to be "reinstated."

Indeed, Rivara testified "Unions put people to work," thus acknowledging the Union's repeated efforts to convince Rivera to return Montgomery to his job, and it is undisputed that the arbitrator ordered that Montgomery be reinstated to his position. (Tr. at 76.) The evidence is consistent, overwhelmingly so, with Rivara refusing to abide by the reinstatement order in the Award.

Further, the court finds the testimony by Abi Oun to have been inconclusive as to the timing of the events. Abi Oun could only remember the day of the week he received the Award, on a Tuesday, but could provide no further detail. In addition, Abi Oun testified that Montgomery never reported to him in October of 2009, and there is no evidence that Montgomery was required to do so. Every other witness, including Rivara, agreed that Montgomery reported to the job site at least three days during October 2009, seeking reinstatement pursuant to the Award. Therefore, his testimony regarding the timing of the events at issue is accorded little weight.

IV.   Damages

Montgomery was finally reinstated as the OSS for the Pile job site on April 28, 2010. (*Id.* at 19; JPTO, Stipulated Facts, at 6.) If Rivara had reinstated Montgomery to work on October 14, 2009, on the date he concedes he received a copy of the Award, Montgomery would have returned to his previous

17

position as OSS.  (Tr. at 39.)  The Union introduced into

evidence as Plaintiff's Exhibit 1 hired truck reports for the

Pile job site, which are issued by the Unions to the OSS.  (*Id.*

at 12; Pl. Ex. 1, Hired Truck Reports ("Hired Truck Reports").)

Bisignano explained that the reports are used to track the hours

of Union members working on the particular site, and is used in

the calculation and the tracking of hours paid into the various

benefit funds.  (Tr. at 12-14; Pl. Ex. 1, Hired Truck Reports.)

The hired truck forms document the number of hours worked by

Nicholasi as OSS from October of 2009 through April of 2010.

The Union also introduced into evidence Plaintiff's Exhibit 3,

containing a summary of the shop steward reports.  (Tr. at 31;

Pl. Ex. 3, Shop Steward Hours.)

        The Union also introduced into evidence as Stipulated

Exhibit (iv) remittance reporting forms for Nicholasi.  (Tr. at

17; ECF No. 13-3, Stipulated Exhibits, Stipulated Exhibit (iv)

("Remittance Reports").)[6]  Bisignano explained that remittance

reporting forms are sent by the different benefit funds to

employers, the employers fill out the forms each month with the

hours that are due to each fund, and then submit the forms with

the corresponding checks to the different benefit funds.  (*Id.*

at 17.)

---

[6] Stipulated Exhibit iv was supplemented at trial to include remittance
reports covering the period through April of 2010.  (Tr. at 20.)

Finally, the Union introduced in evidence as
Plaintiff's Exhibit 4 a chart prepared by Bisignano summarizing
the information contained in the hired truck reports and the
remittance reports, and calculating the wages and benefits paid
to Nicholasi between October 1, 2009 and April 28, 2010. (*Id.*
at 23-25; Pl. Ex. 4, Chart.) The rates charged Nicholasi were
the same rates that would have been charged for Montgomery if
Pile had reinstated Montgomery as the OSS. (Tr. at 25.)
Between October 1, 2009 and April 28, 2010, Nicholasi earned
$44,442.23 in wages and $37,322.71 in benefits. (Tr. at 25-27;
Pl. Ex. 4, Chart.)

**CONCLUSIONS OF LAW**

I.   Arbitration Award is Confirmed

"It is well recognized that it is not within the
province of the federal courts to review the merits of an
arbitration award." *Int'l Chem. Workers Union (AFL-CIO), Local
No. 227 v. Basf Wyandotte Corp.*, 74 F.2d 43, 45 (2d Cir. 1985)
(citing *United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 569
(1960); *Nat'l Union of Elevator Constructors, AFL-CIO v. Nat'l
Elevator Indus., Inc.*, 772 F.2d 10, 12 (2d Cir. 1985)). Courts
"play a limited role" in reviewing arbitration awards issued
pursuant to a collective bargaining agreement, and "are not
empowered to reexamine the merits of an arbitration award, even
though the parties to the agreement may argue that the award

arises out of a misinterpretation of the contract or a factual error." *Int'l Bhd. of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 714 (2d Cir. 1998).

Because "arbitration is essential to this nation's system of labor-management relations, in cases in which the arbitrator acts within the authority granted by contract, the courts must defer to the arbitrator's decision." *Basf Wyandotte Corp.*, **7**74 F.2d at 45 (citations omitted). "Thus, an arbitrator's award is legitimate and enforceable as long as it 'draws its essence from the collective bargaining agreement' and is not merely an exercise of the arbitrator's 'own brand of industrial justice.'" *Niagara Mohawk Power Corp.*, 143 F.3d at 714 (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960)). Even if the court believed that the arbitrator committed a legal or factual error, that will "not justify overturning his decision, provided that the arbitrator is 'even arguably construing or applying the contract and acting within the scope of his authority.'" *Id.* at 715 (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

Here, the arbitrator found that Montgomery "was insubordinate" and that, in light of Section 10(B)(7) of the CBA governing the conduct of an OSS, Montgomery had "committed a serious violation of the collective bargaining agreement."

(Award at 6-8.)  Section 9(F)(2) of the CBA, however, allowed

for discharge of an employee only for just cause.  (06-09 CBA at

12.)  The arbitrator found that Montgomery's "eight years of

service[,] his role as an OSS," and the fact that he was

"discharge[d] without any progressive discipline," were

mitigating factors.  (*Id.* at 8.)  The arbitrator concluded that

"[n]othing in the evidence would suggest that [Montgomery] would

not change his behavior if he were allowed to return to his

position," and therefore rescinded his discharge and replaced it

instead with a suspension without pay.  (*Id.* at 8.)

It is clear that the arbitrator in this case was not

dispensing his "'own brand of industrial justice,'" and was

instead interpreting the relevant provisions of the CBA, namely,

Sections 9(F)(2) and 10(B)(7).  *See Niagara Mohawk Power Corp.*,

143 F.3d at 714 (quoting *Enterprise Wheel & Car Corp.*, 363 U.S.

at 597).  The arbitrator determined whether, in light of

Montgomery's violation of the CBA and the mitigating factors,

Montgomery was discharged for "just cause" as required by the

CBA.  Because the Award "'draws its essence from the collective

bargaining agreement,'" the Award must be confirmed.  *See id.*

(quoting *Enterprise Wheel & Car Corp.*, 363 U.S. at 597); *see*

*also Local 153, Office & Prof. Emps. Union, AFL-CIO v.*

*Depository Trust Co.*, No. 90 Civ. 6930, 1991 WL 146347, at *3

(S.D.N.Y. July 18, 1991) ("In the present case, a reading of the

Award reveals that the Arbitrator's interpretation of the Agreement was the basis of his decision, and that is the only test that his decision must pass.").

Consequently, the court confirms the arbitrator's Award, dated October 1, 2009, that Montgomery be reinstated to his position and his discharge replaced with a suspension without pay.

## II. Pile is Liable to Montgomery for Lost Wages and Benefits

The Award language specifies that "[t]he grievance is sustained to the extent of rescinding the termination of John Montgomery and replacing it with a suspension without pay from March 31, 2009 to the date of his return promptly upon receipt of this award by the parties."  (Award at 9.)  Pile argues that the Award required that Montgomery "return promptly" after receipt of the Award, and that although Montgomery appeared repeatedly at the Pile job site seeking to be reinstated to his position, he did so before Pile received the Award from the arbitrator, but not after Pile received the Award from the arbitrator, and thus Pile is not responsible for any lost wages or benefits.  (ECF No. 22, Defendant's Proposed Findings of Facts ¶ 35; ECF No. 24, Defendant's Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Def.'s Resp.") at 2-3, 5.)  Pile further argues that the Union, not Pile, was responsible for appointing the OSS, and therefore

should have replaced Nicholasi with Montgomery pursuant to the Award.  (Def.'s Resp. at 3.)

The court, however, has already determined that Montgomery reported to work for three days, October 14, 15 and 16, 2009, after the parties, including Pile, received a copy of the Award from the arbitrator.  Moreover, although the Union has the authority to appoint the OSS, it must select from within the employee ranks of the employer.  Here, the Union repeatedly attempted to appoint Montgomery as the OSS for the Pile job site after the Award, but was unable to persuade Pile to reinstate Montgomery pursuant to the Award.

Because Montgomery reported to work at the Pile job site on October 14, 2009, after the parties received the Award from the arbitrator, and Pile refused to reinstate Montgomery until April 28, 2010, Pile is responsible for the damages sustained by Montgomery.  Specifically, Pile is responsible for the wages and benefits Montgomery lost during the period of October 14, 2009 and April 27, 2010.

The court agrees with the Union that the measure of damages in this case is the amount of wages and benefits earned by Nicholasi for the period after Montgomery should have been reinstated to his position as OSS until the date of his reinstatement.  The court disagrees with the Union, however, about the dates of the relevant time period.  The Union argues,

without providing any legal support,[7] that "[i]f Montgomery had been returned promptly he would have received wages and benefits for the period between the date of the Award, October 1, 20[09] and the date of his reinstatement, April 28, 2010." (ECF No. 21, Plaintiff's Proposed Findings of Facts and Conclusions of Law ("Pl's Proposed Findings") at 16.) The Union calculated the damages for lost wages and benefits due from Pile to Montgomery for the period October 1, 2009 through April 28, 2010. (*Id.* at 4, 6, 16.)

The Award, however, directed the reinstatement of Montgomery after "his return promptly upon receipt of this award by the parties." (Award at 9.) Thus, the court finds that the damages for lost wages and benefits incurred due to Pile's failure to abide by the Award began to accrue on October 14, 2009, after Pile received a copy of the Award and Montgomery reported to work at the Pile job site. Moreover, because Montgomery was reinstated as OSS on April 28, 2010, the damages are calculated until April 27, 2010, the last day Nicholasi worked as OSS instead of Montgomery.

---

[7] In its proposed Conclusions of Law section, the Union cites to several cases in support of the argument that "courts uniformly use the date of the arbitration award as the accrual date or at the latest, the date of notification of the final decision." (ECF No. 21, Plaintiff's Proposed Findings of Facts and Conclusions of Law at 15.) The cases cited by the Union, however, relate to accrual of the statute of limitations, not accrual of damages.

Although the hired truck reports document the number of hours worked by Nicholasi for the relevant time period, October 14, 2009 through April 27, 2010, the remittance reporting forms, Stipulated Exhibit (iv), contain only the total hours per month reported to the various funds. (*See* Hired Truck Reports; Remittance Reports.) Because the damages due to Montgomery begin to accrue on October 14, 2009, the benefits paid by Pile for Nicholasi for the entire month of October of 2009, reflected in the remittance reports, overstates the amount of damages Pile is obligated to pay. For this reason, the court requested that the Union submit a new calculation, along with supporting documentation, calculating the relevant damages for the period of October 14, 2009 through April 28, 2010. (*See* Order dated 7/27/2011.) The Union, however, failed to comply with the order. Having previously represented that Plaintiff's Exhibit 4 calculated damages beginning October 1, 2009 (*see* Pl's Proposed Findings at 4, 6, 16), the Union now claims that the damages in that exhibit were calculated starting October 14, 2009. (ECF No. 26, Declaration of Joseph J. Vitale in Support of Plaintiff's Request for Damages and Attorney Fees ("Vitale Decl.") at 2.) The Union does not provide any supporting documentation for its position, nor does it explain the inconsistencies in the submissions.

The court, therefore, relies on the evidence available on the record to calculate the damages for the relevant period. Specifically, the court relies on Plaintiff's Exhibits 1 and 3 to calculate the number of hours worked by Nicholasi between October 14, 2009 and April 27, 2010 to determine the wages due to Montgomery. Further, the court relies on Stipulated Exhibit (iv), the remittance reports, to determine the contributions made by Pile to the various benefit funds on behalf of Nicholasi. Because the remittance reports contain the total number of hours reported to the various funds, and thus overstates the damages for the months of October of 2009 and April of 2010, these hours have been adjusted to approximate the amount due to the various funds on behalf of Montgomery.[8] The court's damages calculations are set out Appendix A.

The court concludes that Pile is liable to Montgomery for $36,910.44 in wages, and to the Union for $10,493.90 in welfare contributions, $8,585.00 in pension contributions, $9,104.25 in annuity contributions, $101.00 in job training, and $3,872.96 in vacation and sick leave.

---

[8] The number of hours worked in the months of October 2009 and April 2010 were lowered in the above figures due to exact start and end dates within those months — hours worked before October 14, 2009 and after April 28, 2010 by Montgomery, were discounted. Benefit hours were then adjusted according to the percentage of the original total hours left after hours before and after the relevant period were discounted.

III. Attorney's Fees and Costs

   Although "Section 301 of the [LMRA] does not provide
for attorney's fees in actions to confirm and enforce an
arbitrator's award," the court "[p]ursuant to its inherent
equitable powers . . . may award attorney's fees when the
opposing counsel acts in bad faith, vexatiously, wantonly, or
for oppressive reasons."  *BASF Wyandotte Corp.*, 774 F.2d at 47
(internal quotations and citations omitted).  "As applied to
suits for the confirmation and enforcement of arbitration
awards, the guiding principle has been stated as follows: 'when
a challenger refuses to abide by an arbitrator's decision
without justification, attorney's fees and costs may properly be
awarded.'"  *Id.* (quoting *Bell Prod. Eng'rs Ass'n v. Bell
Helicopter Textron, Div. of Textron, Inc.*, 688 F.2d 997, 999 (2d
Cir. 1982)); *see also Dist. Council No. 9 v. All Phase Mirror &
Glass*, No. 03 Civ. 0219, 2006 WL 1493112, at *2 (S.D.N.Y. May
26, 2006) (noting that "when a party fails to abide by an
arbitrator's determination without justification, such as the
defendants did in the instant case, attorney's fees may be
awarded").

   Here, the court finds that Pile's failure to abide by
the arbitration award was without justification.  Rivara, the
owner, was in receipt of the Award and aware of the requirement
to reinstate Montgomery.  Despite repeated efforts by the Union

and Montgomery, Rivara refused to comply with the Award, noting several times that he would not reinstate Montgomery and that he disagreed with the arbitrator.  Such dissatisfaction with an arbitrator's award is not justification.  Therefore, the court finds that the Union is entitled to recover reasonable fees and costs.

The Second Circuit has held that all applications for attorney's fees must be accompanied by contemporaneous time records indicating "the date, the hours expended, and the nature of the work done."  *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1154 (2d Cir. 1983).  "In the Second Circuit, courts determine a 'presumptively reasonable fee' award by calculating the product of the hours reasonably expended and a reasonable hourly rate."  *Annuity, Pension, Welfare & Training Funds of the Int'l Union of Op. Engs., Local 14-14B, AFL-CIO by its Trustees v. Saramac Int'l, Inc.*, No. 10-cv-3051, 2011 WL 2713464, at *3 (E.D.N.Y. June 16, 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182 (2d Cir. 2008)).

"Reasonable hourly rates are determined by reference to, inter alia, fees in the community in which the action is pending and to the skill and experience of the attorney who worked on the matter."  *Pennacchio v. Powers*, No. 05 CV 985, 2011 WL 2945825, at *1 (E.D.N.Y. July 21, 2011) (citing *Luciano*

*v. Olsten Corp.*, 109 F.3d 111, 115–16 (2d Cir. 1997); *Arbor Hill*, 522 F.3d at 184). "Recent prevailing hourly rates in the Eastern District are: (1) between two hundred dollars ($200.00) to four hundred dollars ($400.00) for partners; (2) between one hundred dollars ($100.00) to two hundred ninety-five dollars ($295.00) for associates; and (3) between seventy dollars ($70.00) to eighty dollars ($80.00) for legal assistants, including paralegals, or legal interns." *Szczepanek v. Dabek*, No. 10-cv-2459, 2011 WL 846193, at *8 (E.D.N.Y. Mar. 7, 2011) (internal citations omitted).

The Union seeks reimbursement for $20,280.25 in attorney's fees based on 73.05 hours of attorney work at the hourly rate of $260.00, and 13.55 hours of paralegal/law clerk work at the rate of $95.00 per hour. (Vitale Decl. at 4.) The Union has provided the court with detailed contemporaneous time records documenting the hours worked by attorneys, paralegals and law clerks, and describing the work performed. (*See id.*, Ex. B.) The application for attorney's fees also contains a description of the experience and background of the attorneys working on the instant litigation on behalf of the Union. (*See id.* at 4.) Despite having an opportunity to do so, Pile has not objected to the Union's application for attorney's fees.

Upon review of the submissions by the Union, the court finds the number of hours expended reasonable, as is the hourly

rate of $260.00 for the attorneys based on their experience and background.  However, the court finds the hourly rate charged for work performed by paralegals and law clerks to be excessive. In the Eastern District, hourly rates range from "between seventy dollars ($70.00) to eighty dollars ($80.00) for legal assistants, including paralegals, or legal interns." *Szczepanek*, 2011 WL 846193, at \*8.  Moreover, the Union has failed to provide any information regarding the experience and background of the paralegals and law clerks.  Therefore, the court finds that a reduction in the paralegal and law clerk hourly rate is appropriate, to $75.00 per hour.  Accordingly, the court awards the Union a total of $20,009.25 in attorney's fees, based on 73.05 hours of attorney work at the hourly rate of $260.00, and 13.55 hours of paralegal/law clerk work at the rate of $75.00 per hour.

"As for costs, a court will generally award 'those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'"  *Pennacchio*, 2011 WL 2945825, at \*2 (quoting *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998)).  "The fee applicant bears the burden of adequately documenting and itemizing the costs requested." *Id.* (citation omitted)

The Union seeks reimbursement of costs in the amount of $2,123.80, consisting of: (1) $350.00 for the court filing

fee; (2) $67.00 for service of process; (3) $1,068.02 for computer assisted research on Westlaw; (4) $173.90 for photocopies; and (5) $464.88 for the transcript of the bench trial proceedings. (Vitale Decl. at 5.)  The application for reimbursement of costs attaches supporting documentation.  Pile similarly failed to object to the Union's application for costs. The court finds the application for reimbursement of costs reasonable and supported by documentation.  Accordingly, the Union is awarded $2,123.80 in costs.

IV.  <u>Pre-Judgment Interest</u>

"The decision whether to grant prejudgment interest in arbitration confirmations is left to the discretion of the district court." *Serv. Emps. Int'l Union, Local 32BJ, AFL-CIO v. Stone Park Assocs., LLC*, 326 F. Supp. 2d 550, 555 (S.D.N.Y. 2004) (citation omitted).  There is "a presumption in favor of prejudgment interest" in the Second Circuit.  *Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.*, 737 F.2d 150, 154 (2d Cir. 1984); *see also Stone Parks Assocs.*, 326 F. Supp. 2d at 555.  "Courts of this Circuit have found an award of pre-judgment interest to be appropriate where the agreement between the parties states that an arbitration decision is final and binding." *Herrenknecht Corp. v. Best Road Boring*, No. 06 Civ. 5106, 2007 WL 1149122, at *3 (S.D.N.Y. Apr. 16, 2007) (citing *Soft Drink & Brewery Workers Union Local 812, IBT v. Ali-Dana*

*Beverages*, No. 95 Civ. 8081, 1996 WL 420209 (S.D.N.Y. Jul. 25, 1996)).  "Determining the rate of interest to be applied is also within the discretion of the district court."  *Stone Parks Assocs.*, 326 F. Supp. 2d at 555 (citing *Lodges 743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers v. United Aircraft Corp.*, 534 F.2d 422, 446 (2d Cir. 1975).

Here, the CBA governing the relationship between Pile and the Union provides that the "determinations, decisions, and awards" issued under Section 9 of the CBA, including arbitration awards, "shall be final, conclusive and binding upon the parties hereto and may be enforced as any other arbitration award in accordance with the laws of the State of New York."  (06-09 CBA at 13.)  Accordingly, an award of pre-judgment interest is appropriate.  The Union requests that pre-judgment interest be awarded at the prime rate of interest at the time of the application, a rate of 3.25%, compounded daily.  (Vitale Decl. at 2.)  The court finds this rate reasonable, and therefore awards pre-judgment interest at the rate of 3.25%, compounded daily, in the amount of $1,905.88 to Montgomery for pre-judgment interest on wages damages, and $1,626.92 to the Union for pre-judgment interest on contributions.

## CONCLUSION

For the foregoing reasons, the court (1) denies Pile's motion for judgment as a matter of law; (2) confirms the October

32

1, 2009 arbitration award rescinding the termination of
Montgomery and replacing it with a suspension without pay;
(3) awards damages for wages and benefits for the period October
14, 2009 through April 27, 2010, in the following amounts:
(a) $36,910.44 in wages; (b) $10,493.90 in welfare
contributions; (c) $8,585.00 in pension contributions;
(d) $9,104.25 in annuity contributions; (e) $101.00 in job
training; and (f) $3,872.96 in vacation and sick leave;
(4) awards the Union $20,009.25 in attorney's fees and $2,123.80
in costs; (5) awards pre-judgment interest at a rate of 3.25%,
compounded daily, in the amount of in the amount of $1,905.88 to
Montgomery for pre-judgment interest on wages damages, and
$1,626.92 to the Union for pre-judgment interest on
contributions; and (6) post-judgment interest at the rate
provided by law.

        The Clerk of the Court is respectfully requested to
enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated:    August 5, 2011
          Brooklyn, New York

                                    _____/s/_____
                                    **KIYO A. MATSUMOTO**
                                    United States District Judge
                                    Eastern District of New York